Shawn A. McMillan, Esq. – SBN: 208529
attyshawn@netscape.net
Stephen D. Daner, Esq. – SBN: 259689
steve.mcmillanlaw@gmail.com
Adrian M. Paris, Esq. – SBN: 301355
adrian.mcmillanlaw@gmail.com

THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
4955 Via Lapiz
San Diego, California 92122
Telephone: (858) 646-0069
Facsimile: (206) 600-4582

Attorneys for Plaintiffs, J.S.1, J.S.2, T.S., and A.T.
by and through their guardian ad litem, Savanah St.
Clair

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.S.1, J.S.2, T.S., and A.T. by and through their guardian ad litem, Savanah St. Clair | Case No: |
| | **COMPLAINT FOR DAMAGES** |
| Plaintiffs,<br>vs. | Claim 1:  42 U.S.C. §1983 (Unwarranted Seizure) |
| COUNTY OF KERN, a public entity; FERNANDO ROCHA, an individual; LINDA FLORES LOPEZ, an individual; FLORENCE MIRANDA, an individual; DEBRA GREENWOOD, an individual, OFFICER DONALD MARVIN, an individual; OFFICER DOUGLAS WILSON, an individual; KERN MEDICAL CENTER, an entity, DOES 1 through 30, inclusive, | Claim 2:  42 U.S.C. §1983 (Deception) |
| | Claim 3:  42 U.S.C. §1983 (Unlawful Medical Examination) |
| | Claim 4:  Monell Claim (County DHS - Seizure) |
| | Claim 5:  Monell Claim (County DHS - Deception) |
| Defendants. | Claim 5:  Monell Claim (County Sheriff - Seizure) |
| | Claim 7:  Monell Claim (Unlawful Medical Examination) |
| | **DEMAND FOR JURY TRIAL** |

/ / /

*Case No.*

**Jurisdiction and Venue**

1.  Plaintiffs J.S.1, J.S.2, T.S., and A.T. bring this action, by and through their guardian *ad litem* Savanah St. Clair, pursuant to 42 U.S.C. §1983, *et. seq*., to redress the deprivation of rights secured under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, and under federal and state law. These violations were inflicted by each of the Defendants in the manner herein alleged.

2.  Jurisdiction is conferred on this Court by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to section 1983. Jurisdiction is also conferred by 28 U.S.C. §1331.

3.  Because the acts and omissions complained of occurred in the County of Kern, and it is believed that all defendants currently reside in the County of Kern, venue is proper in the Eastern District of California.

4.  These allegations are based on Plaintiffs' personal knowledge, and/or on information and belief.

**Parties**

5.  At all times relevant to this Complaint, Savanah St. Clair ("Savanah") and Andy St. Clair ("Andy") resided in the County of Kern, California, maintaining a family as the parents of their children and the minor Plaintiffs herein, J.S.1, J.S.2, T.S., and A.T.

6.  At all times applicable herein, Defendant COUNTY OF KERN, was and is a public entity ("Kern County" or "County of Kern"). Kern County Department of Human Services ("Kern DHS" or "DHS") is a subdivision, entity, or administrative arm of Kern County. Kern County Sheriff's Department ("Kern Sheriff's Department") is a

1    subdivision, entity, or administrative arm of Defendant County of
2    Kern.

3    7.    Kern County operates, manages, and controls Jamison Children's
4          Center ("Jamison"). (*See* Exhibit A.) The Jess Diamond Child
5          Assessment Center ("Jess Diamond Center") is a multi-disciplinary
6          center located at Jamison. (*See* **Exhibit A** and **Exhibit B**.) Jess
7          Diamond Center Team is comprised of DHS social workers, county
8          counsel, law enforcement, Kern Medical Center, and medical
9          personnel. (*Ibid*.) Jamison operates, manages, and controls the Jess
10         Diamond Center.

11   8.    At all times relevant herein, Defendant FERNANDO ROCHA
12         ("Rocha") is and was an individual residing in the County of Kern,
13         and employed by Kern County as a DHS social worker. At all
14         relevant times herein, Rocha was performing and/or carrying out his
15         official duties as a Kern County official, employee, and/or agent, and
16         was acting under color of law.

17   9.    At all times relevant herein, Defendant LINDA FLORES LOPEZ
18         ("Lopez") is and was an individual residing in the County of Kern,
19         and employed by Kern County as a DHS social worker. At all
20         relevant times herein, Lopez was performing and/or carrying out her
21         official duties as a Kern County official, employee, and/or agent, and
22         was acting under color of law.

23   10.   At all times relevant herein, Defendant FLORENCE MIRANDA
24         ("Miranda") is and was an individual residing in the County of Kern,
25         and employed by Kern County as a DHS social worker. At all
26         relevant times herein, Miranda was performing and/or carrying out

27
28

COMPLAINT FOR DAMAGES

*Case No.*                                                                    2

1    her official duties as a Kern County official, employee, and/or agent,

2    and was acting under color of law.

3    11.   At all times relevant herein, Defendant DEBRA GREENWOOD

4    ("Greenwood") is and was an individual residing in the County of

5    Kern, and employed by Kern County as a DHS supervisor. At all

6    relevant times herein, Greenwood was performing and/or carrying out

7    her official duties as a Kern County official, employee, and/or agent,

8    and was acting under color of law.

9    12.   At all times relevant herein, Defendant DOE 1 is and was an

10   individual residing in the County of Kern, and employed by Kern

11   County as a DHS supervisor. At all times relevant herein, Defendant

12   DOE 1 was Rocha's supervisor. At all relevant times herein, DOE 1

13   was performing and/or carrying out his or her official duties as a Kern

14   County official, employee, and/or agent, and was acting under color

15   of law.

16   13.   At all times relevant herein, Defendant DOE 2 is and was an

17   individual residing in the County of Kern, and employed by Kern

18   County as a DHS supervisor. At all times relevant herein, Defendant

19   DOE 2 was Lopez's supervisor. At all relevant times herein, DOE 2

20   was performing and/or carrying out his or her official duties as a Kern

21   County official, employee, and/or agent, and was acting under color

22   of law.

23   14.   At all times relevant herein, Defendant DOE 3 is and was an

24   individual residing in the County of Kern, and employed by Kern

25   County as a DHS supervisor. Defendant DOE 3 was Lopez's

26   temporary or interim supervisor on, or about, November 2013. At all

27   relevant times herein, DOE 3 was performing and/or carrying out his

28

---

COMPLAINT FOR DAMAGES

1    or her official duties as a Kern County official, employee, and/or

2    agent, and was acting under color of law.

3    15.   At all times relevant herein, Defendant DOE 4 is and was an

4    individual residing in the County of Kern, and employed by Kern

5    County as a DHS supervisor. Defendant DOE 4 was Lopez's

6    temporary or interim supervisor on, or about, December 2013. At all

7    relevant times herein, DOE 4 was performing and/or carrying out his

8    or her official duties as a Kern County official, employee, and/or

9    agent, and was acting under color of law.

10   16.   At times when one or the other was indisposed or otherwise

11   unavailable, DOES 1-4 would cover for each other in the disposition

12   of their supervisory duties, which included signing court reports

13   under penalty of perjury.

14   17.   At all times relevant herein, Defendant OFFICER DONALD

15   MARVIN ("Officer Marvin") is and was an individual residing in the

16   County of Kern, and employed by Kern County as a Kern County

17   Sheriff Deputy. At all relevant times herein, Officer Marvin was

18   performing and/or carrying out his official duties as a Kern County

19   official, employee, and/or agent, and was acting under color of law.

20   18.   At all times relevant herein, Defendant OFFICER DOUGLAS

21   WILSON ("Officer Wilson") is and was an individual residing in the

22   County of Kern, and employed by Kern County as a Kern County

23   Sheriff Deputy. At all relevant times herein, Officer Wilson was

24   performing and/or carrying out his official duties as a Kern County

25   official, employee, and/or agent, and was acting under color of law.

26   19.   At all times relevant herein, Defendant DOES 1-10 are and were

27   individuals residing in the County of Kern, and employed by Kern

28

---

COMPLAINT FOR DAMAGES

County as DHS social workers. At all relevant times herein, DOE 1-10 were performing and/or carrying out their official duties as Kern County officials, employees, and/or agents, and were acting under color of law.

20.  At all times relevant herein, Defendant DOES 11-20 are and were individuals residing in the County of Kern, and employed by Kern County as Kern County Sheriff Deputies. At all relevant times herein, DOES 11-20 were performing and/or carrying out their official duties as Kern County officials, employees, and/or agents, and were acting under color of law.

21.  Defendant KERN MEDICAL CENTER ("KMC") is a medical center located in the County of Kern. KMC is operated, managed, and/or controlled by Kern County. In the alternative, KMC performs these medical examinations pursuant to a contract with Kern County. KMC is member of the Jess Diamond Center Team. (*See* Exhibit A.) KMC willfully performs forensic investigatory medical examinations in collaboration with and for the Kern County. (*See* Exhibit A.) John Digges, MD is employed by KMC, and serves as the Medical Director for the Jess Diamond Center and the Forensic Pediatrician for Kern County. (*See* Exhibit C.)

22.  Defendant Doctor DOES 21-30 are and were individuals residing in the County of Kern, and employed by Kern County and KMC. Defendant Doctor DOES 21-30 voluntarily collaborated with DHS, and willfully participated in conducting forensic medical examinations at KMC. Defendant Doctor DOES 21-30 are Kern County employees and/or agents. Kern County compensated KMC

---

COMPLAINT FOR DAMAGES

1    and Defendant Doctor DOES 21-30 for performing the forensic

2    medical examinations alleged herein.

3    23.   Plaintiff is ignorant of the true names and capacities of those

4          Defendants sued as DOES 1 through 30. When ascertained, Plaintiffs

5          will amend this Complaint by inserting their true names and

6          capacities.

7    24.   At all times mentioned herein, each of the above identified

8          Defendants were acting under color of law in committing the acts

9          alleged, and were acting within the course and scope of their duties.

10   25.   Defendants were the knowing agents and/or alter egos of one another.

11         Defendants directed, ratified, and/or approved each other's conduct

12         and that of each other's agents or employees. Defendants agreed

13         upon, approved or ratified each other's conduct, or otherwise

14         conspired together to commit all of the acts and/or omissions alleged

15         herein. The above defendants are responsible for the occurrences

16         complained of, and conspired with, and/or aided and/or abetted each

17         other in committing the acts complained of.

18                              **General Allegations**

19   26.   Savanah and Andy were married in 2009. They are the biological

20         parents of T.S., J.S.1, and J.S.2. A.T. is Savanah's biological child

21         and Andy has cared for A.T. as his own child since 2008. In

22         September 2013, A.T. was 10, T.S. was 4, and the twins J.S.1., and

23         J.S.2 were two years and nine months old. Savanah and Andy were

24         adequately caring for their children for many years, and enjoyed a

25         strong and loving bond with their children.

26

27

28

---

COMPLAINT FOR DAMAGES

27.     Peggy St. Clair is Andy's mother, and the childrens' paternal grandmother. John Traver is Savanah's father, and the children's maternal grandfather.

28.     In September 2013, Savanah, Andy and the children all lived together as a family unit in a home owned by Savanah's father, John Tarver. In exchange for rent, Andy was gradually remodelling the house.

29.     On September 13, 2013, Savanah received a full-time academic genetic research appointment with the University of California, Riverside. She was officially hired on September 25, 2013. Andy worked in construction and was studying for the Contractors State Licensing Exam.

31.     In September 2013, A.T. and T.S. were excelling in school.[1] A.T. was classified as a Gifted and Talented student. As of September 24, 2013, A.T., T.S., J.S.1., and J.S.2. were happy and healthy, well cared for, free of all distress and not in need of medical attention.

32.     Andy and Savanah possessed California medical marijuana authorization documents, which were prescribed by their doctor. California law permits a person to legally possess and cultivate marijuana for their personal medical purposes. Cal. Health & Saf. Code §§11362.5 and 11362.775. Pursuant to California law, Plaintiffs legally possessed raw medical marijuana and were cultivating medical marijuana plants. Andy was medically authorized to cultivate and grow up to ninety (90) medical marijuana plants.

33.     All medical marijuana plants were, at all times, inaccessible to the Plaintiffs children. A small number of plants were grown 500 yards from Plaintiffs' house, on the same property, in a locked double

---

[1] At this time, J.S.1 and J.S.2 were not yet old enough to attend school.

fenced enclosure. The remaining plants were grown in a detached and locked workshop on the property which was at all times inaccessible to the Plaintiff children.

34.    Savanah stopped using medical marijuana on September 13, 2013, in anticipation of her new research appointment and as such did not pose any threat to the safety of her children.

35.    On July 31, 2013, Andrew "Duke" Maxwell, Plaintiffs' neighbor, entered Plaintiffs' front yard and shot Plaintiffs' baby goat. Plaintiffs J.S.1 and J.S.2. witnessed this grim event and were traumatized by it.

36.    Maxwell's harassment continued. On August 2, 2013, Maxwell called Kern DHS, and made a bad faith report of child neglect against Plaintiffs parents Savanah and Andy. No allegation of any type of physical abuse was reported. Maxwell alleged that Plaintiffs' yard was dirty with construction trash, that J.S.1. and J.S.2. were dirty, and that Plaintiffs' were cultivating marijuana. Maxwell also informed DHS that he did not contact law enforcement regarding the marijuana cultivation.

37.    Around August 6, 2013, a general neglect allegation was assigned for investigation as a non-emergency referral. Defendant Rocha was assigned the investigation. In August, Rocha twice attempted to initiate his investigation. But, between August 2, 2013 through September 23, 2013, no DHS social worker, including Rocha, ever contacted Andy or Savanah or otherwise met with the children.

38.    On September 24, 2013, Andy and Savanah had not partaken of marijuana at all. Nor were they under the influence of any drugs or alcohol.

/ / /

*Unwarranted Entry and Seizure*

39.   On September 24, 2013, Rocha set out to visit the St. Clair home. He requested law enforcement assistance. Officer Marvin was assigned to provide assistance.

40.   At around 11:30 a.m., Defendants Rocha and Officer Marvin arrived at the St. Clair home, and knocked on the side door. Andy met them outside. Officer Marvin demanded entry into the home, and requested that the family dog be locked up. Andy permitted Officer Marvin and Rocha into the yard. Andy did not consent or invite Officer Marvin or Rocha to enter the family home. Rather, Officer Marvin pushed passed Andy and entered the home without consent and over Andy's objection. Rocha followed Officer Marvin and barged into the St. Clair home by force and without consent.

41.   Upon entry into the home, Officer Marvin and Rocha observed raw medical marijuana on a table in the living room. Savanah was seated on the couch. Rocha and Marvin demanded to see Savanah and Andy's medical marijuana authorization documents. Savanah and Andy both complied.

42.   At this time, A.T. and T.S. were both at school. J.S.1 and J.S.2 were napping in their bedroom with the door closed, but unlocked.

43.   Without consent to search the home, Rocha wandered around the home until he found the room where J.S.1 and J.S.2 were sleeping. The bedroom, including the floor, was clean, and there was no noticeable odor. Rocha did not observe any feces or other unsanitary matter in the bedroom. Andy and Savanah tended to J.S.1 and J.S.2.

44.   Next, Rocha searched the pantry and refrigerator. Both were stocked with food and adequate supplies for the children. Rocha demanded

---

COMPLAINT FOR DAMAGES

that Andy prove the house had running water. Andy complied.
Officer Marvin stayed downstairs with Savanah.

45.   At this time, Savanah made arrangements with Peggy St. Clair to pick up and care for J.S.1 and J.S.2, in the event Savanah and Andy were arrested. Peggy St. Clair agreed to take care of all the children, and started to make the forty (40) mile commute from Bakersfield, CA.

46.   Defendant Rocha continued to search the home, and observed raw medical marijuana in Andy and Savanah's bedroom.

47.   Defendant Rocha took out a camera and began taking pictures. Andy and Savanah again objected to Rocha's unwarranted search of their home and further objected to Rocha taking pictures of their home during the unwarranted search. Rocha ignored their objections, and continued to take photographs of the home and family.

48.   Savanah continuously objected that Rocha and Marvin were searching the home without permission or consent. Savanah asked how Officer Marvin was permitted to search Plaintiffs' home without their permission or consent. Officer Marvin lied to the Plaintiffs, and claimed that their permission was not required because children were present. Officer Marvin and Rocha continued to search Plaintiffs' home.

49.   Officer Marvin contacted Officer Wilson and explained the situation. Officer Wilson advised that he would head over to Plaintiffs' home.

50.   At around 12:30 pm, Savanah informed Officer Marvin that she had to pick up A.T. and T.S. from school. Officer Marvin prohibited Savanah from picking up her children. Instead, he commanded Savanah to remain in the home and to find someone else to do it. Savanah made arrangements for her father, John Tarver, to pick up

---

1  and care for A.T. and T.S. John Tarver also agreed to care for A.T.

2  and T.S. in case Plaintiffs were arrested. Savanah informed Officer

3  Marvin that her father had agreed to and was able to care for A.T. and

4  T.S.

5  51.  Plaintiffs explained to Officer Marvin and Rocha that A.T., T.S.,

6  J.S.1, and J.S.2 were not permitted to be in any room containing

7  medical marijuana without supervision and demonstrated that all

8  marijuana was locked away and non-accessible to the children.

9  52.  Officer Wilson arrived at Plaintiffs' house. Peggy St. Clair also

10  arrived about the same time.

11  53.  Peggy St. Clair informed Rocha, Officer Marvin, and Officer Wilson

12  that she was ready, willing, and able to care for J.S.a and J.S.2 as

13  Savanah had requested and arranged.

14  54.  Officers Marvin and Wilson demanded access to Andy's locked

15  workshop. Andy unlocked the workshop. Officers Marvin and Wilson

16  saw Andy's medical marijuana plants.

17  55.  Sometime after 3:00 pm, Kern County Code Enforcement Officer Al

18  Rojas arrived at the St. Clair home. Officer Rojas examined Andy's

19  medical marijuana plants. He alleged that Andy was growing too

20  many medical marijuana plants, and was in violation of a County

21  ordinance.

22  56.  The medical marijuana plants, located in Andy's locked workshop,

23  were surrendered, and removed. Officers Marvin and Wilson further

24  removed all marijuana that was located inside the home. As such,

25  even if the plants had posed some sort of speculative danger to the

26  children, once the plants were removed, any such danger was

27  ameliorated.

28

COMPLAINT FOR DAMAGES

57.   Officer Rojas deemed the medical marijuana plants, growing outside in the locked double fenced enclosure, permissible, and allowed these plants to remain untouched.

58.   Officer Marvin observed and confirmed that both J.S.1 and J.S.2 had suffered no physical injuries, and did not require any medical assistance.

59.   Rocha, Officer Marvin, Officer Wilson, and DOES 1 through 20, conferred and discussed A.T., T.S., J.S.1, and J.S.2's proposed seizure and removal from their parents' custody. All agreed to seize A.T., T.S., J.S.1, and J.S.2 without judicial authorization and without first obtaining the consent of either parent. Rocha, Officer Marvin, Officer Wilson, and DOES 1 through 20, assisted each other in the unwarranted seizure and/or were integral participants in that unwarranted seizure.

60.   Rocha discussed A.T., T.S., J.S.1, and J.S.2's proposed seizure and removal from their parents' custody with his supervisor, Defendant Greenwood and/or DOES 1 through 20. After hearing all relevant information, Greenwood and/or DOES 1 through 20 agreed and affirmed the decision to seize A.T., T.S., J.S.1, and J.S.2 without a court order or judicial authorization even though none of the children were in immediate danger and their parents had made arrangements for their care in the event Andy and/or Savanah were arrested.

61.   At this time, A.T., T.S., J.S.1, and J.S.2 were not in immediate danger of suffering serious bodily injury.

62.   Officer Marvin also signed the "Transfer of Custody" form for A.T., T.S., J.S.1, and J.S.2

63.   Officer Marvin commanded Andy and Savanah to sit down. At this time, Officer Marvin stated that A.T., T.S., J.S.1, and J.S.2 were being seized and removed from Andy and Savanah's custody. They were shocked and could say nothing. Andy cried. The lack of a verbal response upset Rocha, and he became aggressive. Rocha demanded that Savanah call her father John Tarver immediately, and advise him that A.T. and T.S. were also being seized and removed. Should Savanah refuse, Rocha threatened that he and law enforcement would tear John Tarver's house to pieces. At this moment, Rocha stood shoulder to shoulder with Officer Marvin, who was armed. Marvin did not intercede or intervene in the situation to stop Rocha's aggressive behaviors or to otherwise reign him in. Rather, Marvin participated in the event by standing by in a menacing and supportive manner. Savanah felt intimidated and that she had no other options. She did as she was told, and called her father.

64.   Defendant Miranda arrived at the St. Clair home about this time.

65.   Andy and Savanah again reiterated their desire for Peggy St. Clair to care for J.S.1 and J.S.2. and explained to Rocha that arrangements had been made with Peggy St. Clair to care for the children. However, Rocha ignored Andy and Savanah's arrangements and seized both J.S.1 and J.S.2, had them strapped into the DHS van, and driven off.

66.   At around 4:00 pm, Defendant Miranda took J.S.1 and J.S.2 and transported them to Kern Medical Center and had them both medically examined, without a warrant or other similar court order authorizing the medical examination even though the children appeared to be in good health and not experiencing any form of medical emergency.

COMPLAINT FOR DAMAGES

68.     Sometime after 4:00 pm, Rocha arrived at John Traver's house. Rocha observed and confirmed that A.T. and T.S. were healthy, had no visible injuries, displayed no signs of abuse, and were appropriately dressed for the weather.

69.     John Traver confirmed that Savanah arranged with him for the continued care of A.T. and T.S. and advised that he was ready, willing, and able to care for A.T. and T.S. Rocha rejected the arrangement. Rocha did not inquire or express any concern regarding John Tarver's ability to care for A.T. and T.S.

70.     Rocha reiterated that the decision to seize A.T. and T.S. had already been made. In accordance with this prior decision, Rocha seized A.T. and T.S. without judicial authorization and/or consent and in the marked absence of any form of emergency. Rocha transported A.T. and T.S. to Kern Medical Center where both children were medically examined without their parents' knowledge and/or consent and without a court order authorizing the examination even though they appeared to be in good health and were experiencing no form of medical emergency.

71.     At around 6:00 pm, Officers Marvin informed Andy and Savanah, for the first time ever, that they were being placed under arrest.

## ***Unwarranted and Non-Consensual Medical Examination***

72.     All four of the children were medically examined, without parental consent, in the absence of any form of emergency, and without court authorization or any other form of lawful authority. As expected, the examinations revealed that all children were healthy and there was no evidence of physical harm or exposure to medical marijuana.

---

COMPLAINT FOR DAMAGES

73.    Defendant Miranda transported J.S.1 and J.S.2 to Kern Medical Center for a forensic investigatory medical examination. Likewise, Rocha transported A.T. and T.S. to Kern Medical Center for a forensic investigatory medical examination. Neither parent consented to such an examination, and no court order or warrant was obtained to authorize such an examination.

74.    At Kern Medical Center, Doctor DOES 21-30, performed forensic investigatory medical and physical examinations on A.T., T.S., J.S.1, and J.S.2 These were performed without notice and/or parental knowledge or consent, without a court order, and in the absence of exigent circumstances. At this time, A.T., T.S., J.S.1, and J.S.2 did not require any form of immediate medical assistance.

75.    These examinations were not undertaken in an effort to treat or heal A.T., T.S., J.S.1, and J.S.2 Instead, KMC performs these examinations in willful collaboration with and for Kern County DHS. KMC jointly and actively participates in all DHS investigations regarding child abuse.

76.    Defendants Rocha, Miranda, KMC, or Doctor DOES 21-30 undertook no effort to obtain parental consent or a court order authorizing these forensic medical examinations. Instead, it was Kern County and KMC's custom and standard operating procedure to perform these forensic investigatory medical examinations without a court order or parental consent.

77.    Andy and Savanah were completely excluded from A.T., T.S., J.S.1, and J.S.2's forensic investigatory medical examinations, and were not allowed to be in close proximity.

COMPLAINT FOR DAMAGES

78.    These forensic examinations found no visible injuries or other indicia of abuse.

### *Unwarranted Interrogation of The Child A.T.*

79.    On September 25, 2013, Defendant Lopez interviewed, interrogated, and/or questioned A.T. for around one (1) hour. This interview was conducted without parental consent and without judicial authorization.

80.    A.T., age 10, advised that she was not the victim of any type of abuse, had never suffered any physical abuse, and was never exposed to any marijuana or other drug.

### *Deception in the Presentation of Evidence*

81.    After the minor Plaintiffs' unwarranted seizure and unwarranted medical examinations and interrogations, Rocha drafted certain reports, and other documents, pertaining to his investigation and interaction with the other Defendants and the Plaintiffs. Rocha included false statements, and/or suppressed known exculpatory evidence, in these reports. Rocha knew that these reports, and other documents, would be reviewed, examined, and/or relied upon by subsequent Kern County social workers and by the juvenile court in making its custody and detention decisions.

82.    On September 26, 2013, Defendant Lopez drafted the Juvenile Dependency Petition ("Petition") for A.T., T.S., J.S.1, and J.S.2 The "Petition" is an official document prepared by DHS and filed with the Superior Court to initiate formal juvenile dependency proceedings. By law, the Petition is required to be verified under penalty of perjury and must not contain false and/or untrue statements.

---

COMPLAINT FOR DAMAGES

83.   Defendant Lopez did not conduct a reasonable investigation to determine the truth and veracity of the factual statements she set out in the Petition, and Lopez was not present at Plaintiffs' home on September 24, 2013.

84.   On September 26, 2013, Defendant Lopez signed the Petition under penalty of perjury, and attested to the veracity of all information contained therein. After signing the petition "under penalty of perjury," Lopez filed it with the juvenile court. Kern County Counsel Teresea A. Goldner read and endorsed the petition. Defendant DOE 2 reviewed and approved the Petition.

85.   The Petition included known material false statements. By way of example, the Petition stated that (1) J.S.1 and J.S.2 were found locked in their bedroom, (2) J.S.1 and J.S.2 bedroom smelled of feces, and (3) feces was located on the floor. The Petition also falsely stated that Savanah is incarcerated and cannot arrange for A.T., T.S., J.S.1, and J.S.2's care. In fact, before Savanah and Andy were arrested, they had already made arrangements for the continued care and custody of their children in the event they were arrested.

86.   Lopez further omitted exculpatory evidence from the Petition. By way of example, Lopez failed to disclose that A.T., T.S., J.S.1, and J.S.2 were never exposed to medical marijuana or smoke, or that the alleged numerous marijuana plants were fenced and/or locked away and inaccessible to the children.

87.   On September 26, 2013, Defendant Lopez drafted the Detention Report for A.T., T.S., J.S.1, and J.S.2 A "Detention Report" is an official document that is filed with the juvenile dependency court in advance of the Detention Hearing. The Detention Hearing is generally

the first hearing that takes place in a juvenile dependency action. A Detention Report is the primary evidentiary document the juvenile court will rely on in making its *prima facie* findings regarding the propriety of the detention of a child from its parents and/or family home. The matter set out in the Detention Report is required to be honest, accurate, and complete in all material respects.

88. On September 26, 2013, Defendant Lopez signed the Detention Report and caused it to be filed with the juvenile court intending that the juvenile court admit it into evidence and rely upon it in making its custody decisions. Without personal knowledge of the facts or investigation, Defendant DOE 2 reviewed and signed the Detention Report. DOE 2 had no personal knowledge as to the veracity, or lack thereof, of the statements set out in the Detention Report. Lopez and DOE 2 did not conduct a reasonable investigation to determine the truth and veracity of the factual statements set out in the Detention Report.

89. The Detention Report included false statements and omitted known exculpatory evidence.

90. The Detention Hearing was held on September 27, 2013. At this time, Savanah was out of custody. She attended the hearing.

91. At the Detention Hearing, the Petition was considered, and the Detention Report was accepted into evidence. The juvenile court considered and relied upon the false, inaccurate, and incomplete statements contained in the Petition and Detention report. Based on the false and materially incomplete information before it, the juvenile court ordered that A.T., T.S., J.S.1, and J.S.2 would continue to be detained from their parents' custody and care.

92.   A.T. was placed in the Jamison Center, and was removed from her school. T.S., J.S.1, and J.S.2 were placed in Emergency Foster Care.

93.   Lopez refused to allow the children to see, speak, or visit their parents or family until October 5, 2013.

94.   On October 7, 2013, J.S.2 was injured while in DHS approved Emergency Foster Care Provider Cynthia McKinley's custody. J.S.2 received three stitches on his face. Following this incident, A.T., T.S., J.S.1, and J.S.2 were immediately moved to Peggy St. Clair's house.

95.   Even though the juvenile court placed no restriction on the children's ability to talk to their parents on the phone, Lopez refused to permit the children to speak with their parents while they were with Peggy St. Clair. If they disobeyed, Lopez threatened to send A.T., T.S., J.S.1, and J.S.2 back to foster care, where she implied they might get hurt again. Lopez had an evil grin and cackled when conveying this threat Andy and Savanah.

96.   Around the end of October, A.T. was moved to Vincent Burroughs home.

97.   On October 25, 2013, Lopez filed the Jurisdiction Report. She signed this report under penalty of perjury.

98.   At this time, Defendant DOE 3 was Lopez's acting supervisor and co-signed the report under penalty of perjury. DOE 3 did not investigate the matters set forth in the report in any way. DOE 3 had no personal knowledge as to the veracity, or lack thereof, of the statements set out in the Jurisdiction Report. In signing the Jurisdiction Report, DOE 3 did not alert the juvenile court that the statements contained in the report were not based on DOE 3's independent or personal investigation.

99.  Lopez and DOE 3 failed to conduct a reasonable investigation to determine the truth and veracity of the factual statements set out in the Jurisdiction Report.

100. The Jurisdiction Report included false statements, omitted known exculpatory evidence, and reiterated many of the same false statements set out in the Detention Report and Petition.

101. The Jurisdiction Hearing was scheduled for November 4, 2013, but was continued at a contested hearing and rescheduled for December 10, 2013.

102. By the end of November, Andy and Savanah had completed parenting classes and were enrolled in additional classes. Their house and property was also cleaned up. Lopez refused to inspect and evaluate their home and instead continued to detain the minor plaintiffs from their family home even though she knew there was no basis to continue to do so.

103. On December 10, 2013, Lopez filed the Disposition Report. She signed the report under penalty of perjury.

104. At this time, Defendant DOE 4 was Lopez's acting supervisor and co-signed the report under penalty of perjury. DOE 4 did not investigate the matters set forth in the report in any way. DOE 4 had no personal knowledge as to the veracity, or lack thereof, of the statements set out in the Disposition Report. In signing the Jurisdiction Report, DOE 4 did not alert the juvenile court that the statements contained in the report were not based on DOE 4's independent or personal investigation.

105. The Disposition Report included false statements, omitted known exculpatory evidence, and reiterated many of the same false

---

statements set out in the Detention Report, Petition, and Jurisdiction Report. The Disposition Report also included new false material. By way of example, Lopez stated that Andy and Savanah were making no progress toward reunification. Defendant Lopez also falsely stated that the court had assumed jurisdiction of the four minors on November 4, 2013. This was blatantly false.

106. On December 10, 2013, the juvenile court strongly encouraged DHS to visit and inspect the parents' home.[2]

107. The jurisdictional matter was held and argued over several hearings. Over the course of these hearings, T.S., J.S.1, and J.S.2 were returned to their parents' custody.

108. Ultimately, in January 2014, the juvenile court found no basis for jurisdiction, and dismissed A.T., T.S., J.S.1, and J.S.2's Petitions.

109. A.T., T.S., J.S.1, and J.S.2 were returned to their parents' custody.

110. Plaintiffs have not obtained the Juvenile Case Files for A.T., T.S., J.S.1, and J.S.2. Plaintiffs will file Cal. Welf. & Inst. Code, §827 requests for disclosure of the Juvenile Case Files shortly. Therefore, the foregoing recitation of misrepresentations and suppressions are exemplary in nature, and alleged with reservation of the right to introduce additional evidence of misrepresentation and suppression at time of trial, based on new interpretation or information uncovered during the Cal. Welf. & Inst. Code, §827 proceedings and/or discovery process. Additionally, Plaintiffs shall reserve the right to seek leave of court to amend this pleading, should additional facts, including the identity of other culpable persons, be later discovered.

---

[2] The Juvenile Court did not order this action, because it had not taken jurisdiction, and was unsure whether it had the power to issue an inspection order.

1

## FIRST CLAIM FOR RELIEF – §1983

2

### *The Unwarranted Seizure of A.T., T.S., J.S.1, and J.S.2 in Violation of*

3

### *Plaintiffs' Fourt Amendment Right to Familial Association*

4

(By all Plaintiffs Against Defendants Officer Marvin, Officer Wilson, Rocha,

5

Greenwood, Miranda, and Defendant DOES 1 through 20, inclusive.)

6   111.   The minor Plaintiffs reallege, and to the extent applicable, incorporate

7   herein as if set forth in full, paragraphs 1 through 110.

8   112.   At all times relevant herein, the right to familial association

9   guaranteed under the First and Fourth Amendments to the United

10   States Constitution was clearly established, such that any reasonable

11   social services agent and/or police officer would know that it is

12   unlawful to seize a child from the care, custody, and control of his or

13   her parent(s) or to question, threaten, examine, or search a child in the

14   absence of exigent circumstances without first obtaining a warrant to

15   do so.

16   113.   Defendants Officer Marvin, Officer Wilson, Rocha, Greenwood,

17   Miranda, and Defendant DOES 1 through 20, inclusive, were acting

18   under color of state law when they jointly acted, agreed, and/or

19   conspired to violate Plaintiffs' constitutional rights by, but not limited

20   to, entering Plaintiffs' home and seizing, removing, detaining, and

21   continuing to detain the minor Plaintiffs A.T., T.S., J.S.1, and J.S.2

22   from their parents' care, custody, and/or control.

23   114.   Defendants Officer Marvin, Officer Wilson, Rocha, Greenwood,

24   Miranda, and Defendant DOES 1 through 20, inclusive, entered

25   Plaintiffs' home and seized, removed, and/or detained A.T., T.S.,

26   J.S.1, and J.S.2 from their parents' care, custody, and/or control –

27   without judicial authorization, parental consent, a court order, and/or

28

---

1  exigent circumstances. At that time of seizure, A.T., T.S., J.S.1, and
2  J.S.2 were each in good health, did not need any medical care, and
3  had no signs of visible injuries, marks or bruises. Officer Marvin also
4  specifically verified that J.S.1 and J.S.2 did not have any physical
5  injuries and did not require any medical assistance.

6  115.  Prior to A.T., T.S., J.S.1, and J.S.2's unwarranted seizure, Defendants
7  Officer Marvin, Officer Wilson, Rocha, Greenwood, and Defendant
8  DOES 1 through 20, inclusive, and each of them, discussed the
9  proposed warrantless seizure. They all agreed and/or approved of the
10  decision to forgo obtaining judicial authorization prior to seizing
11  A.T., T.S., J.S.1, and J.S.2 from their parents' care, custody, and/or
12  control.

13  116.  Defendants Officer Marvin, Officer Wilson, Rocha, Greenwood,
14  Miranda, and Defendant DOES 1 through 20, inclusive, and each of
15  them together, were joint and/or integral participants in A.T., T.S.,
16  J.S.1, and J.S.2's seizure from their parents' care, custody, and/or
17  control. These Defendants failed to intervene and stop A.T., T.S.,
18  J.S.1, and J.S.2's seizure.

19  117.  Prior to the seizure, Defendants Officer Marvin, Officer Wilson,
20  Rocha, Greenwood, Miranda, and Defendant DOES 1 through 20,
21  inclusive, failed to interview all witnesses and never spoke with A.T.
22  or T.S.

23  118.  As a direct and proximate consequence of this violation, Plaintiffs
24  have suffered, and will continue to suffer, damages, including but not
25  limited to, physical and/or mental anxiety and anguish according to
26  proof at trial.

27
28

119. Defendants Officer Marvin, Officer Wilson, Rocha, Greenwood, Miranda, and Defendant DOES 1 through 20, inclusive, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against these individual defendants.

## **SECOND CLAIM FOR RELIEF – §1983**

***Violation of Plaintiffs' Fourteenth Amendment Due Process Right to Be Free From Deception in the Presentation of Evidence to the Juvenile Court***

(By all Plaintiffs Against Defendants Rocha, Lopez,

DOES 1 through 20, inclusive.)

120. Plaintiffs reallege and restate each of the foregoing allegations as if set forth herein in full.

121. At all times relevant herein, there existed a clearly established due process right of individuals not to be subjected to false accusations by government officials, including the deliberate presentation of false or perjured evidence, and/or by the suppression of exculpatory information in court proceedings or in documents submitted with recommendations or requests made to the court. Any reasonable social services agent and/or government agent would know that it is a due process violation, under the Constitution's Fourteenth Amendment, to lie, exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in court reports and other documents filed with the juvenile court, and/or relied upon by subsequent social workers.

122. Defendants Rocha, Lopez, and DOES 1-20, and each of them, had the affirmative and self evident duty to be truthful, accurate, and complete in petitions, reports, and documents submitted to the

---

COMPLAINT FOR DAMAGES

juvenile court – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents. Similarly, defendants had an equal duty to refrain from using improper and deceptive means to obtain judicial orders sustaining recommendations disparaging and/or otherwise impairing or impinging upon Plaintiffs' due process rights.

123.   Defendants Rocha, Lopez, and DOES 1-20, and each of them, either singularly or jointly acted, and/or conspired, to deliberately or recklessly present false statements and/or omit known exculpatory omissions material in the Juvenile Dependency Petition and/or reports filed in the Juvenile Court. This deceptive conduct caused A.T., T.S., J.S.1, and J.S.2's continued and prolonged detention of Plaintiffs from the care, custody, and/or control of their parents.

125.   Defendants Rocha, Lopez, and DOES 1-20 were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, engaging in deception in the presentation of evidence to the juvenile court.

126.   As a direct and proximate consequence of this violation, Plaintiffs have suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

127.   Defendants Rocha, Lopez, and DOES 1-20 acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against these individual defendants.

/ / /

**THIRD CLAIM FOR RELIEF – §1983**

*Unwarranted, Non-Consensual Forensic Medical Examinations of A.T., T.S., J.S.1, and J.S.2 in Violation of Plaintiffs' Constitutional Rights*

(By Plaintiffs Against Defendants Kern County and Kern Medical Center Doctor DOES 21-30, inclusive.)

128.   Plaintiffs reallege and restate each of the foregoing allegations as if set forth herein in full.

129.   The right to family association includes the right of children to have their parents make important medical decisions for them, rather than the state. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). Absent parental consent, court order, or exigent circumstances medical examinations may not be undertaken for investigative purposes at the behest of state officials. *Ibid*. Children also have a constitutional right to have their parents with them or reasonably nearby while they are receiving medical attention or to be in close proximity while all or a part of the medical procedure is being conducted. *Id*. at 1142. The right of a child to not be subjected to medical and physical examinations in the absence of a warrant, parental consent, or emergency was so clearly established that Defendant Doctor DOES 21-30, would know it violated Plaintiffs' constitutional rights.

130.   On September 24, 2013, Doctor DOES 21-30, performed forensic medical and physical examinations on A.T., T.S., J.S.1, and J.S.2 These forensic investigatory examinations were performed without parental notice and/or knowledge, without parental consent, without court order, and in the absence of exigent circumstances. Plaintiffs'

1  parents were completely excluded from attending these medical
2  examinations and/or being in close proximity.

3  131.  As a direct and proximate result of Defendants' conduct, Plaintiffs'
4  rights arising under the Fourth and Fourteenth Amendments to the
5  United States Constitution were violated; and, Plaintiffs have suffered
6  damages thereby, as according to proof at trial.

7  132.  Defendant Doctor DOES 21-30 conduct as herein alleged were
8  intentional and/or with a conscious disregard for Plaintiffs' rights. As
9  a result of their conduct, Plaintiffs are entitled to recover punitive
10  damages.

11  **FOURTH CLAIM FOR RELIEF – *MONELL* RELATED CLAIMS FOR**
12  **UNWARRANTED SEIZURES AND EXAMINATIONS BY KERN COUNTY**
13  **SOCIAL WORKERS**

14  **(**By Plaintiffs Against Defendant County of Kern and DHS)

15  133.  Plaintiffs reallege and restate each of the foregoing allegations as if
16  set forth herein in full.

17  134.  Kern County and DHS had a duty to implement and follow policies,
18  procedures, customs and/or practices (hereinafter referred to as
19  "customs") which confirm and provide the protections guaranteed
20  under the United States Constitution. Kern County and DHS further
21  had a duty to use reasonable care to train, supervise, and/or control its
22  agents, so as to protect these constitutional rights.

23  135.  Based on the duties charged to its social workers, including the
24  powers to seize a child from his or her parents' custody, Kern County
25  knew or should have known of the need to establish the customs,
26  policies, and/or procedures required to protect the civil rights of

27
28

---

parents and children with whom their agents regularly came into contact, and of the need to adequately train its social workers.

136.   At the time of the underlying events, the County's customs relating to the removal of a child from its parent's custody and/or the seeking unwarranted and non-consensual examinations of the removed child included, but were not limited to:

a.   The custom of removing children from their parent's custody without consent, court order, and/or exigent circumstances (i.e., imminent danger of serious bodily injury).

b.   The custom of removing children from their parent's custody without first performing a reasonable investigation.

c.   The custom of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation could turn up facts suggesting the seizure was justified.

d.   The custom to not intercede in and/or prevent the removal of a child from his or her parent's custody without consent, court order, and/or exigency.

e.   The custom of interrogating and/or examining a child outside the presence of its parent(s) –  without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

e.   The custom to always seek forensic investigatory medical examinations on children – without parental consent, court order, and/or exigent circumstances.

137.   When Rocha, Greenwood, Miranda, and DOES 5-20, agreed to seize, participated in the seizure, and/or seized A.T., T.S., J.S.1, and J.S.2 from their parents' custody, they were acting pursuant to and in accordance with Kern County's child removal customs. Indeed, A.T., T.S., J.S.1, and J.S.2's seizure received DHS supervisor approval. When Rocha, Miranda, and DOES 5-20, sought the forensic investigatory medical examinations on A.T., T.S., J.S.1, and J.S.2, without parental consent, court order, and/or exigent circumstances, they were acting pursuant to and in accordance with Kern County's customs.

138.   A.T., T.S., J.S.1, and J.S.2's unwarranted seizure and/or the failure to prevent the seizure, was not an isolated incident. Instead, Kern County social workers regularly seized children from their parent's custody without consent, court order, and/or exigency – as is the customary practice at Kern County and DHS. These unlawful seizures have resulted in lawsuits and claims against multiple offending social workers (for violation of constitutional rights) and Kern County (for its customs being the moving force behind these violations). These include, but are not limited to, the following: (1) *McCue v. South Fork Union School District*, Case No. 1:10-CV-00233-OWW-DLB, and (2) claims made by Christine Deeths.

139.   A.T., T.S., J.S.1, and J.S.2's unwarranted and non-consensual forensic investigatory medical examinations, were not an isolated incident. Instead, Kern County social workers regularly seek unwarranted and non-consensual forensic investigatory medical examinations for children – as is the customary practice at Kern County and DHS.

---

140.   Kern County regularly receives and/or is aware of complaints, leveled against its social workers, claiming that the social workers seized children without parental consent, court order, and/or exigency. Kern County never investigates or disciplines its social workers (including those named as Defendants in the lawsuits and claims identified in ¶141) who seize children from their parents' custody without consent, court order, and/or exigency. Kern County never investigates or disciplines its social workers who seek forensic investigatory medical examinations for children without parental consent, court order, and/or exigent circumstances. Kern County did not investigate or discipline Rocha, Greenwood, Miranda, and/or DOES 5-20, for (1) seizing, or participating in the seizure of, A.T., T.S., J.S.1, and J.S.2 without consent, court order, and/or exigency, (2) failing to stop A.T., T.S., J.S.1, and J.S.2's unwarranted removal, and (3) seeking forensic investigatory medical examinations for children without parental consent, court order, and/or exigent circumstances.

141.   Kern County refuses to admit that its social workers commit a constitutional violation when they (1) seize a child from his or her parent's custody without consent, court order, and/or exigency, and (2) seeks forensic investigatory medical examinations – and continues to do so. Kern County denies that Rocha, Greenwood, Miranda, and DOES 5-20, violated Plaintiffs' rights when A.T., T.S., J.S.1, and J.S.2 were seized without consent, court order, and/or exigency. Kern County denies that Rocha, Miranda, and DOES 5-20, violated Plaintiffs' rights when A.T., T.S., J.S.1, and J.S.2 were subjected to forensic investigatory medical examinations without parental consent, court order, and/or exigent circumstances. Kern County ratified

---

COMPLAINT FOR DAMAGES

1   and/or approved of A.T., T.S., J.S.1, and J.S.2's unwarranted seizure

2   and/or the forensic investigatory medical examinations for A.T., T.S.,

3   J.S.1, and J.S.2

4   142.   Kern County failed to train its social workers and agents on the

5   constitutional rights of a parent and child, including but not limited

6   to:

7   a.   The circumstances under which a court order must be obtained

8   prior to removing a child from the custody of his or her

9   parent(s).

10   b.   The fact that a court order or parental consent must be obtained

11   prior to removing a child from the custody of his or her

12   parent(s), when there was no exigency.

13   c.   That a child cannot be removed without a court order or

14   parental consent, unless there is "specific, articulable evidence"

15   that a child is in immediate danger of suffering serious bodily

16   injury.

17   d.   That a social worker cannot remove a child without a court

18   order or consent, based on the hope that further investigation

19   could turn up facts suggesting that an exigency existed.

20   e.   That a child cannot be removed from their parent's custody

21   without first performing a reasonable investigation.

22   f.   That a child cannot be interrogated or examined outside the

23   presence of his or her parent(s) – without judicial authorization

24   or parental consent – when there is no specific, reasonable, and

25   articulable evidence that the child is in immediate risk of

26   suffering serious bodily injury.

27

28

COMPLAINT FOR DAMAGES

g.   That a child cannot be subjected to a forensic investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

h.   That a parent, being placed under arrest, is entitled to arrange for the care of his or her child.

i.   That the arrest of a parent does not permit an unwarranted seizure – by itself.

143.   Kern County's failure to train its social workers and/or agents on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training, Rocha, Greenwood, Miranda, and DOES 5-20 were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they seized A.T., T.S., J.S.1, and J.S.2, and subjected them to forensic investigatory medical examinations – without parental consent, court order, and/or exigency.

144.   Kern County knew or should have known that a parent and child cannot be separated and that a child cannot be subjected to a forensic investigatory medical examination without consent, court order, and/or exigency. But, the County knowingly refrained from (1) revising its customs, and (2) training its social workers that a child cannot be removed or subjected to a forensic investigatory medical examination without consent, court order, and/or exigency. In addition, Kern County refused to investigate or discipline its social workers for removing A.T., T.S., J.S.1, and J.S.2, and subjecting them to forensic investigatory medical examinations – without parental consent, court order, and/or exigency.

145. These actions, and/or inactions, of Kern County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF – *MONELL* RELATED CLAIMS FOR DECEPTION IN THE PRESENTATION OF EVIDENCE BY KERN COUNTY SOCIAL WORKERS

(By Plaintiffs Against Defendant County of Kern)

146. Plaintiffs reallege and restate each of the foregoing allegations as if set forth herein in full.

147. Kern County and DHS had a duty to implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "customs") which confirm and provide the protections guaranteed under the United States Constitution. Kern County and DHS further had a duty to use reasonable care to train, supervise, and/or control its agents, so as to protect these constitutional rights.

148. Based on the duties charged to its social workers, including the responsibility to present evidence and recommendations to the juvenile court, Kern County knew or should have known of the need to establish the customs, policies, and/or procedures required to protect parents due process rights, and of the need to adequately train its social workers.

149. At the time of the underlying events, the County's customs relating to documents, reports, and evidence presented to and/or filed with the juvenile court, included, but were not limited to:

1        a.    The custom of including false, inaccurate, exaggerated,

2             misleading, and/or untrue factual statements in the documents

3             and/or reports filed with the juvenile court.

4        b.    The custom of suppressing and/or omitting known exculpatory

5             evidence in the documents and/or reports filed with the juvenile

6             court.

7        c.    The custom of including knowingly false and/or unsupported

8             Cal. Welf. & Inst. Code, §300 allegations in juvenile

9             dependency petitions.

10      d.    The custom for County Counsel to review and endorse all

11            juvenile dependency petitions.

12      e.    The custom of permitting a social worker to sign a petition or

13            other court report, under penalty of perjury, without conducting

14            an independent investigation to determine whether the

15            allegations and/or facts stated in the petition, document, and/or

16            report were true.

17      f.    The custom of permitting a social worker to sign a petition,

18            under penalty of perjury, without conducting an independent

19            investigation to determine whether there was sufficient

20            evidence to support the allegations stated therein.

21      g.    The custom of attesting to the veracity of factual statements

22            without personal knowledge as to whether such statements

23            were true or not.

24      h.    The custom of stating allegations in Juvenile Dependency

25            Petitions, regardless of whether or not specific, articulable

26            evidence exists at the time to support the allegation.

27

28

---

COMPLAINT FOR DAMAGES

150. When Rocha, Lopez and/or DOES 1-20, engaged in deception in the presentation of evidence to the juvenile court, they were acting pursuant to and in accordance with Kern County's customs. Indeed, the reports and/or other documents, filed with the juvenile court, were reviewed and approved by a DHS supervisor.

151. Deception in the presentation of evidence to the juvenile court, regarding Plaintiffs, A.T., T.S., J.S.1, and J.S.2, was not an isolated incident. Instead, Kern County social workers regularly include false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court. Kern County social worker's deception in the presentation of evidence to the juvenile court has resulted in lawsuits and claims against multiple offending social workers (for violation of constitutional rights) and Kern County (for its customs being the moving force behind these violations). These include, but are not limited to, the following: (1) *McCue v. South Fork Union School District*, Case No. 1:10-CV-00233-OWW-DLB, and (2) claims made by Christine Deeths.

152. Kern County regularly receives and/or is aware of complaints, leveled against its social workers, claiming that the social workers are engaging in deception in the presentation of evidence in the juvenile court. Kern County never investigates or disciplines its social workers (including those named as Defendants in the lawsuits and claims identified in ¶154) who engage in deception in the presentation of evidence to the juvenile court. In fact, Lopez was a Defendant in *McCue v. South Fork Union School District*, Case No. 1:10-CV-00233-OWW-DLB, based on the claim that she engaged in deception in the presentation of evidence in the juvenile court. Kern County did

not investigate or discipline Lopez, and/or DOES 1-20, for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the juvenile court.

153.   Kern County refuses to admit that its social workers commit a constitutional violation when they make false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. Kern County denies that Rocha, Lopez, and/or DOES 1-20, violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. Kern County ratified and/or approved of Rocha, Lopez, and/or DOES 1-20's inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

154.   Kern County failed to train its social workers and agents on the constitutional rights of a parent and child, including but not limited to:

a.   That a social worker must disclose all known exculpatory evidence to the juvenile court.

b.   That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the juvenile court.

c.   That a social worker is precluded from lying to and/or including false statements in documents or reports to the juvenile court.

d. That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers.

e. That a social worker is precluded from lying to and/or including false statements in documents and/or reports that will be relied upon by subsequent social workers.

155. Kern County's failure to train its social workers and/or agents on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training Rocha, Lopez, and DOES 1-20 were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they included false statements and/or suppressed know exculpatory evidence in their reports.

156. Kern County knew or should have known that a parent and child possess a due process right to be free from deception in the presentation of evidence to the juvenile court.

157. These actions, and/or inactions, of Kern County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF – *MONELL* RELATED CLAIMS FOR UNWARRANTED SEIZURES BY KERN COUNTY SHERIFF'S DEPUTIES**

(By Plaintiff Against Defendant County of Kern and Kern County Sheriff's Department)

158. Plaintiffs reallege and restate each of the foregoing allegations as if set forth herein in full.

159. Kern County and Sheriff's Department had a duty to implement and follow policies, procedures, customs and/or practices (hereinafter

---

COMPLAINT FOR DAMAGES

referred to as "customs") which confirm and provide the protections guaranteed under the United States Constitution. Kern County and Sheriff's Department further had a duty to use reasonable care to train, supervise, and/or control its agents, so as to protect these constitutional rights.

160.  Based on the duties charged to its deputies, including the powers to seize children from their parents' custody, Kern County knew or should have known of the need to establish the customs, policies, and/or procedures required to protect the civil rights of parents and children with whom their agents regularly came into contact, and of the need to adequately train its deputies.

161.  At the time of the underlying events, the County's customs relating to the removal of a child from its parent's custody included, but were not limited to:

a.  The custom of removing children from his or her parent's custody without consent, court order, and/or exigent circumstances (i.e., imminent danger of serious bodily injury).

b.  The custom of removing children from his or her parent's custody without first performing a reasonable investigation.

c.  The custom of seizing children from his or her parent's custody without consent, court order, and/or exigency, based on a hope that further investigation could turn up facts suggesting the seizure was justified.

d.  The custom to not intercede in and/or prevent the removal of a child from his or her parent's custody without consent, court order, and/or exigency.

e. The custom of always seizing children without judicial authorization from his or her parent's custody, when that parent was being placed under arrest, regardless of whether or not that parent could and/or did arrange for care of the child.

f. The custom of entering a citizen's home without prior court order, express consent, and/or exigent circumstances.

162. When Officer Marvin, Officer Wilson, and DOES 5-20, agreed to, and did, seize A.T., T.S., J.S.1, and J.S.2 from their parents' custody, they were acting pursuant to and in accordance with Kern County and the Sheriff's Department's child removal customs.

163. A.T., T.S., J.S.1, and J.S.2's unwarranted seizure and/or the failure to prevent the seizure, was not an isolated incident. Instead, Kern County Sheriff Deputies regularly seized children from their parent's custody without consent, court order, and/or exigency – as is the customary practice at Kern County and the Sheriff's Department. These unlawful seizures have resulted in lawsuits against multiple offending Sheriff's Deputies (for violation of constitutional rights) and Kern County (for its customs being the moving force behind these violations). This includes, but is not limited to, the following: *McCue v. South Fork Union School District*, Case No. 1:10-CV-00233-OWW-DLB.

164. Kern County regularly receives and/or is aware of complaints, leveled against its sheriff's deputies, claiming that the deputies seized children without parental consent, court order, and/or exigency. Kern County never investigates or disciplines its deputies (including those named as Defendants in the lawsuits and claims identified in ¶166) who seize children from their parents' custody without consent, court

order, and/or exigency. Kern County did not investigate or discipline Officer Marvin, Officer Wilson, and/or DOES 5-20, for seizing, or participating in the seizure of, A.T., T.S., J.S.1, and J.S.2 without consent, court order, and/or exigency. Kern County did not investigate or discipline Officer Marvin, Officer Wilson, and DOES 5-20, for failing to stop A.T., T.S., J.S.1, and J.S.2's unwarranted removal.

165. Kern County refuses to admit that its Deputies commit a constitutional violation when they seize a child from his or her parent's custody without consent, court order, and/or exigency – and continues to do so. The County denies that Officer Marvin, Officer Wilson, and DOES 5-20, violated Plaintiffs' rights when A.T., T.S., J.S.1, and J.S.2 were seized without consent, court order, and/or exigency. Kern County ratified and/or approved of A.T., T.S., J.S.1, and J.S.2's unwarranted seizure.

166. Kern County failed to train its sheriff's deputies and agents on the constitutional rights of a parent and child, including but not limited to:

a.   The circumstances under which a court order must be obtained prior to removing a child from the custody of his or her parent(s).

b.   The fact that a court order or parental consent must be obtained prior to removing a child from the custody of his or her parent(s), when there was no exigency.

c.   That a child cannot be removed without a court order or parental consent, unless there is "specific, articulable evidence"

1
2

that a child is in immediate danger of suffering serious bodily injury.

3
4
5

d.      That a sheriff deputy cannot remove a child without a court order or consent, based on the hope that further investigation could turn up facts suggesting that an exigency existed.

6
7

e.      That a child cannot be removed from their parent's custody without first performing a reasonable investigation.

8
9

f.      That a parent, being placed under arrest, is entitled to arrange for the care of his or her child.

10
11

g.      That the arrest of a parent does not permit an unwarranted seizure – by itself.

12
13
14
15
16
17

167.   Kern County's failure to train its sheriff deputies and/or agents on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training, Officer Marvin, Officer Wilson, and DOES 5-20 were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they seized A.T., T.S., J.S.1, and J.S.2 – without consent, court order, and/or exigency.

18
19
20
21
22
23
24

168.   Kern County knew or should have known that a parent and child cannot be separated without consent, court order, and/or exigency. But, the County knowingly refrained from (1) revising its child removal customs, and (2) training it deputies that a child cannot be removed without consent, court order, and/or exigency. In addition, Kern County refused to investigate or discipline its sheriff deputies for removing a child without consent, court order, and/or exigency.

25
26

169.   These actions, and/or inactions, of Kern County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result,

27
28

1     Plaintiffs have sustained general and special damages, in an amount

2     to be proven at trial.

3  **SEVENTH CLAIM FOR RELIEF – *MONELL* RELATED CLAIMS FOR**

4  **UNWARRANTED MEDICAL EXAMINATIONS**

5  (By Plaintiffs Against Defendant Kern County and Kern Medical Center)

6  170.  Plaintiff realleges, and to the extent applicable, incorporates herein as

7     if set forth in full, Paragraphs 1 through 172.

8  171.  The right to family association includes the right of parents to make

9     important medical decisions for their children, and the rights of

10    children to have their parents make medical decision for them, rather

11    than the state. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).

12    Absent parental consent, court order, or exigent circumstances

13    medical examinations may not be undertaken for investigative

14    purposes at the behest of state officials. *Ibid*. Parents also have a

15    constitutional right to be with their children while they are receiving

16    medical attention or to be in close proximity while all or a part of the

17    medical procedure is being conducted. *Id*. at 1142.

18  172.  These constitutional protections and mandates apply equally to

19    government and to those private parties who are willful or voluntary

20    participants with the government in conducting unwarranted forensic

21    medical examinations. *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

22  173.  Kern County and Kern Medical Center had a duty to and obligation to

23    recognize, acknowledge, and respect the constitutional rights of

24    Plaintiffs, and to conduct themselves in a manner that confirms,

25    provides for the preservation of, and does not violate these rights.

26    Kern Medical Center had a duty to implement and follow policies,

27    procedures, customs and/or practices (hereinafter referred to as

28

"customs") which confirm and provide the protections guaranteed under the United States Constitution. Kern County and Kern Medical Center further had a duty to use reasonable care to train, supervise, and/or control its agents, so as to protect these constitutional rights.

174. At the time of the underlying events, Kern County and Kern Medical Center's regularly established customs and practices, that were followed, adhered to, complied with, and carried out by its employees, agents, and/or contractors, included, but were not limited to:

 a. The custom and practice of performing forensic investigatory medical examinations on children without parental consent, court order, and/or in the absence of exigent circumstances.

 b. The custom and practice of excluding parents from their child's forensic investigatory medical examinations, and not permitting parents to be in close proximity.

 c. The custom and practice of never conducting an independent investigation and/or inquiry to determine whether or not there is a basis for performing an unwarranted and non-consensual forensic investigatory medical examination.

 d. The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the

First and Fourteenth Amendments, when performing actions related to child abuse investigations.

175. When Kern County and Kern Medical Center's employees, doctors, agents, and/or Doctor DOES 21-30 performed the forensic investigatory medical examinations on A.T., T.S., J.S.1, and J.S.2 they acted pursuant to, and in accordance with Kern County and Kern Medical Center's customs. Kern County and Kern Medical Center's employees, doctors, agents, and/or Doctor DOES 21-30 voluntarily collaborated with DHS, and willfully participated in conducting forensic medical examinations at KMC.

176. Kern County and Kern Medical Center never investigates or disciplines its employees, doctors, and/or agents who perform forensic investigatory medical examinations on children – without consent, court order, exigency, and/or inquire to determine whether there was a basis to perform the examinations. Kern County and Kern Medical Center did not investigate or discipline employees, doctors, agents, and/or DOES 21-30, for performing forensic investigatory medical examinations on children – without consent, court order, exigency, and/or inquire to determine whether there was a basis to perform the examinations.

177. Kern County and Kern Medical Center failed to train its employees, doctors, and/or agents on the constitutional rights of a parent and child, including but not limited to:

   a.   The circumstances under which forensic investigatory medical examinations can be performed without parent consent and/or court order.

b.     The fact that a court order or parental consent must be obtained prior to performing a forensic investigatory medical examination on a child, when there was no exigency.

c.     The fact that parents enjoy the right to be present for and/or in close proximity to the forensic investigatory medical examination of their child.

d.     The requirement to independently investigate and/or inquire as to whether or not there is a basis for performing an unwarranted and non-consensual forensic investigatory medical examination.

177.   Kern County and Kern Medical Center's failure to train its employees, doctors, and/or agents on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training, Kern County and Kern Medical Center's employees, doctors, agents, and/or Doctor DOES 21-30 were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they performed forensic investigatory medical examinations on A.T., T.S., J.S.1, and J.S.2 – without parental consent, court order, exigency, and/or inquire to determine whether there was a basis to perform the examinations.

178.   Kern County and Kern Medical Center's unwarranted and non-consensual forensic medical examinations on A.T., T.S., J.S.1, and J.S.2 were not an isolated incident specific to this case. On the contrary, these unwarranted and non-consensual medical examinations are regular and recurring events, and are perpetrated by Kern County and Kern Medical Center in the same or similar circumstances as alleged herein. Indeed, Kern County and Kern

1   Medical Center employees the Forensic Pediatrician for Kern County.

2   (*see* Exhibit C.) They continue to engage in these unconstitutional

3   practices, and will continue to do so until ordered to stop.

4   179.   Kern County and Kern Medical Center's customs, policies, and/or

5   practices of were the moving force behind, and the direct and

6   proximate cause of the injuries sustained by Plaintiffs. As a result,

7   Plaintiffs have sustained general and special damages, to an extent

8   and in an amount to be proven separately at trial.

9   **PRAYER**

10   WHEREFORE, PLAINTIFFS pray for judgment against DEFENDANTS,

11   and each of them as follows:

12   1.   Plaintiffs, and each of them, demand a jury trial as to the issues so

13   triable;

14   2.   General damages and special damages according to proof;

15   3.   Punitive damages as allowed by law, against the individual

16   defendants only and not against any municipal defendant;

17   4.   Attorneys fees pursuant to 42 U.S.C. §1988, and any other

18   appropriate statute;

19   5.   Injunctive relief, both preliminary and permanent, as allowed by law;

20   6.   Costs of suit incurred herein;

21   7.   Such further relief as allowed by law; and

22   8.   Such further relief as the Court deems just and proper.

23

24   Dated: October 22, 2020   THE LAW OFFICES OF SHAWN A. MCMILLAN, APC

25

26   /S/Shawn A. McMillan .
Shawn A. McMillan, Esq.

27   Stephen D. Daner, Esq.
Adrian M. Paris, Esq.

28   Attorneys for Plaintiffs

# Exhibit A

# Exhibit A

# Exhibit A

**Bakersfield (Main Office)**
**100 E California Ave**
**Bakersfield, CA 93307**
**(661) 631-6000**
**(661) 631-6200 (TTY)**
CONTACT   COUNTY HOME   SEARCH

DHS Home    Child Abuse Reporting    Jamison Children's Center    Family Finding    Safely Surrender    Statistics





Apply For Benefits



**Interactive Voice Response System**
Automated Services by Phone
Call 1-877-410-8812

**Need to find an ATM that accepts EBT cards in your area and know the surcharge (cost)? Select or go to the following link:** ebtnearme.org



Report Child Abuse



Mandated Reporters

In 1981, the A. Miriam Jamison Children's Center was established in response to the growing number of reported child abuse cases in Kern County.

The Jamison Children's Center is a 24-hour emergency shelter and protective custody facility, operated by the Human Services Department of Kern County. As the only emergency shelter in Kern County for abused, neglected and exploited children, Jamison Children's Center temporarily houses children who are taken into protective custody by law enforcement agencies or social workers. Children come to Jamison Children's Center from all backgrounds and walks of life.

A. Miriam Jamison Children's Center (license #157201327)
1010 Shalimar Drive
Bakersfield, CA 93306
Telephone: 661-334-3500
Fax: 661-366-6591



Fostering economic opportunity and financial security for California's working families and individuals

**DHS News**

**February is Safely Surrender Awareness Month**



English PSA 1 2
Spanish PSA 1 2
more info...

## Vision Statement

"To provide children who need emergency shelter and protection a safe, warm and nurturing environment."



**Feb 25 - Lamont**
**Mar 10 - Mojave**
JobFest on Facebook
List of Events

## Mission Statement

"Provide the abused, neglected, and abandoned children of Kern County a temporary, safe haven where their needs can be met."



www.heartgallerykc.com

Heart Gallery of America

- Assist the children with their personal care, education and recreational needs
- Assure that each child receives medical, dental, or mental health care when necessary
- Identify each child's unique needs and locate appropriate resources to meet them
- Assist the child's social worker in developing the best placement option for each child, whether it be reunification with the family or an alternative placement
- Provide child welfare staff appropriate information that is descriptive of the child's current physical, emotional and health status
- Promote the child's growth and well being by providing programs that promote self-esteem, self-reliance and a sense of accomplishment



Become a Resource Foster Parent

Flipbooks:
English Espanol

Every month, more than 180 children are cared for at Jamison Children's Center. The children are provided the basic living essentials: food, clothing, shelter, education and health care. The center also provides a dedicated, hard working staff of teachers, mental health counselors, group counselors, medical professionals and other staff, including volunteers, to replace the children's fear with hope, and a sense of security.

**Healthy Choices**
your access point to guidance on food and nutrition

The majority of children taken in by the Jamison Children's Center are under age 12. The average length of stay at the center is five days. Some children remain for longer periods of time. Children from infancy to 5 years old stay at the center no



**Public Service Announcements:**
Child Abuse   Child Abuse Prevention   Pool Safety
"Who is watching your child?"
Opportunities, Options, Empowerment
English 1 2 3 Spanish 1 2 3

longer than six hours, requiring Human Services to constantly promote recruitment efforts for foster care homes.

Every day foster care homes are needed for:

- Long-term Foster Care (all ages)
- Emergency Foster Care (newborn - 6 years)
- Sibling Groups
- Medically Fragile Children
- Substance-exposed Infants
- Teenage Mothers and their Infants

For more foster care information call
**661-631-6204**

## Partnerships & Collaborations

Partners collaborate to provide seamless service to meet the needs of children. Human Services partners with various agencies and community-based organizations to coordinate an immediate response in providing a protective environment for every child.

## Kern County Superintendent of Schools

- Two Full-time Teachers
- One Substitute Teacher
- Two Instructional Aides

## Kern County Mental Health Care

- Crisis Intervention
- Mental Health Evaluations
- Mental Health Counseling
- Follow-up Services with foster parents and/or parents to ensure the continuation of a child's care.

## Kern Medical

- The Child Health and Disability Prevention (CHDP) Program provides physical and dental exams.

## Jess Diamond Child Assessment Center

An on-site multi-disciplinary center, designed to decrease the trauma experienced by a victimized child.

- Human Services - Child Protective Services
- County Counsel of Kern
- Forensic Interviewers
- District Attorney's Office
- Kern County Sheriff's Office
- Bakersfield Police Department
- Kern Medical
- Kern County Mental Health Department
- Victim Witness/Kern County Probation Department

## Volunteers & Community Support

Although Jamison Children's Center is funded through a county tax supported budget, government revenue is decreasing at a time when reported cases of child abuse continue to rise. Generous contributions of items and time by the people of Kern County assure the needs of children at Jamison Children's Center are met.

**Volunteer Support**

Opportunities to make a difference in a child's life exist for individuals who wish to volunteer on a regular basis, and for business and civic groups willing to donate their time and effort to take on a special project to benefit the Jamison Children's Center.

**Community Support**

The Jamison Children's Center receives support from the community throughout the year. Donations of "gently used" children's clothing, shoes, toys and games are always welcome.

For more Volunteer information call
**661-334-3500**

©1996-2016, by the Kern County Department of Human Services

**Combating Gang Violence**
Info  Interagency referral form
Project 180  Garden Pathways (Facebook)
New Life Training Center  Stay Focused



INFO
PSA
Fact
Sheet



Kern County Elections
Sample Ballot/Polling Place
Election Results

## General Info

| | |
|---|---|
| Administrative & Program Support Services | CalWORKs Policy Guides |
| Child Protective Services Statistics | DHS Contracts |
| DHS Jobs | Employment & Financial Services Maps |
| Executive Staff Information | Hotline Numbers |
| Office Hours & Locations | Mental Health Information |
| Resource Directory: English Spanish | Partners |
| | Stop Domestic Violence |

## Employee Links

| | |
|---|---|
| Employee Email | Employee Menu |
| Office 365 | Virtual Office |

Website Usage Policy

# Exhibit B

# Exhibit B

# Exhibit B

# KERN

CONTACT   **Carl Guilford**
Kern County Department of Human Services,
Jess Diamond Center
1010 Shalimar
Bakersfield, CA 93306

☐ Urban  ☐ Rural  ☒ Combination
Phone: 661  631-6907/631-6908
Fax:    661  631-6926
Email:  guilfoc@co.kern.ca.us

## GENERAL INFORMATION

| | |
|---|---|
| Operational Since: | 1998 |
| Age range: | 4-18 |
| Approx. No. of Children a Yr: | 271 in 2006 |
| Area served: | Kern County |

## TEAM COMPOSITION

| | | | |
|---|---|---|---|
| Child Protective Services: | ☒ Yes ☐ No | Medical: | ☒ Yes ☐ No |
| Law Enforcement: | ☒ Yes ☐ No | Advocacy: | ☐ Yes ☐ No |
| Prosecution: | ☒ Yes ☐ No | Other: | ☐ Yes ☐ No |

## TYPES OF CASES

| | | |
|---|---|---|
| ☒ Felony | ☒ Physical Assault | ☒ Witness to Domestic Violence |
| ☐ Elder Abuse | ☐ Developmentally-delayed Clients | ☐ Previous Disclosure Required |
| ☒ Misdemeanor | ☒ Sexual Assault | |

## INTERVIEW PROCESS

| | |
|---|---|
| Number of interviewers: | 7 |
| Interviewers come from the following agencies: | Child Protective Services |
| Special qualifications or training for interviewers: | Master's level Social Worker preferred (not required); Participation in CATTA training; Must have experience in child protective services. |
| Provide interviews in languages other than English: | Spanish |
| Bilingual interviewers: | ☒ Yes ☐ No |
| Interpreters: | ☐ Yes ☒ No |
| Interpreters court-certified: | ☐ Yes ☒ No |

## MISSION STATEMENT

The Jess Diamond Child Assessment Center Team is committed to work in partnership with the community and each entity represented on the Team to serve children who are suspected victims of abuse.

## FACILITY INFORMATION

Stand alone

| | | | |
|---|---|---|---|
| Sq Feet: | 5000-6000 | Rooms: | 3 |

2 interview rooms; 1 medical exam room

# Exhibit C

# Exhibit C

# Exhibit C

CONTACT US    FOR ASSISTANCE, CALL 661.326.2000        Search...


✚ KernMedical | *Health for Life.*

**About    Services    Physicians    Your Visit    Support Us    Health Professionals**

Kern Medical > About Our Doctors > John Digges, MD


## PHYSICIAN SEARCH

Select Categories...

# John Digges, MD

**Division of Pediatrics**



Dr. Digges received his Medical Doctorate Degree from the University of Oklahoma. He also received a Masters of Science Degree from the University of Arizona, and both a Masters in Public Health and a Ph.D. in Health from the University of Oklahoma. He completed the first year of a Family Practice Residency at Oklahoma Teaching Hospitals and then completed a residency program in Pediatrics at Oklahoma Children's Memorial Hospital. He practiced general pediatrics from 1984 until 1998, and since 1998 he has limited his private practice to addressing the needs of children with ADHD.

## RESOURCES

+ Maps & Directions
+ News & Events
+ About Bakersfield
+ Kern Medical Foundation

Dr. Digges joined the Courtesy staff of Kern Medical in 1990 and became an Associate in Pediatrics in 1998. He serves as the Medical Director of the Jess Diamond Child Assessment Center and as the Forensic Pediatrician for Kern County, providing examinations and consultations in cases where there is a concern about child abuse. He is a member of the Continuing Medical Education Committee for Kern Medical and is a CME surveyor for the California Medical Association.

Dr. Digges has served as the Chairman of the Kern County Tobacco Free Coalition since 1995, on the Board of Directors of the Kern County Chapter of the the American Lung Association since 1997, on the Board of Directors of the Kern County Immunization Coalition since 1999, on the Technical Advisory Committee of the First 5 Commission of Kern County since 1999 and as a member of the Board of Directors of the Kern County Medical Society since 2000.

**Certificates and Affiliations:**

- Certified, American Board of Pediatrics
- Fellow, American Academy of Pediatrics
- Member, California Medical Association
- Member, American Professional Society on the Abuse of Children (APSAC)

# Contact Us  Visit Us      Follow Us

For Assistance, Call 661.326.2000

Contact us via email

Associate Director of Medical Education

Human Resources

Medical Student Program Coordinator



Kern Medical
1700 Mount Vernon Avenue
Bakersfield, CA 93306

 Twitter

 Facebook

 Google Plus

Privacy and Usage Policy